Kristofer D. Leavitt, Esq.
LEAVITT LEGAL GROUP, P.C.
Nevada Bar No 13173
8670 W. Cheyenne Avenue, Suite #120
Las Vegas, Nevada 89129
(702) 423-7208
kleavitt@leavittlegalgroup.com

*Attorney for Plaintiff Nicole Houle*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| NICOLE HOULE,<br><br>                 Plaintiff,<br><br>vs.<br><br>THE MIRAGE CASINO-HOTEL LLC; BAR TENDER'S UNION 165;<br><br><br>                 Defendants. | Case No.: 2:17-cv-00258-GMN-GWF<br><br><br>**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

Plaintiff Nicole Houle ("Ms. Houle"), by and through her counsel of record at Leavitt Legal Group, P.C., hereby moves the Court, pursuant to Fed. R. Civ. P. 65(a) ("Rule 65(a)"), for a preliminary injunction against Defendants The Mirage Casino-Hotel LLC (the "Mirage") and Bar Tender's Union 165 (the "Union") (collectively as the "Defendants"), enjoining them from allowing Dariusz Nastal ("Nastal") and Lindsay Howard ("Howard") to continue working at Tom Colicchio's Heritage Steak (the "Heritage").

The Mirage suspended Nastal and Howard, and subsequently terminated Nastal, after Nastal and Howard knowingly and willfully participated in creating a hostile work environment for Ms. Houle by engaging in inappropriate sexual activity at the Heritage; conspired with other coworkers to fabricate a story to discredit, and potential terminate, Ms. Houle; and made threatening remarks to and about Ms. Houle.  Both Nastal and Howard have since returned to work at the Heritage and have developed a coordinated plan to retaliate against Ms. Houle which, if successful, could easily lead to her termination.  Ms. Houle has informed the Mirage

and the Union about this conspiracy, but neither of them have taken steps to protect Ms. Houle from continued retaliation.  For this reason, Ms. Houle's only hope for recourse lies with the Court.

This Motion is made and based upon the following Memorandum of Points and Authorities, the Declaration of Ms. Houle (the "Houle Declaration") attached hereto as **Exhibit 1**, the other exhibits attached hereto, and the papers and pleadings on file with the Court.

DATED this 27th day of February, 2017.

LEAVITT LEGAL GROUP, P.C.

By:      /s/ Kristofer Leavitt
Kristofer D. Leaivtt, Esq. (13173)
229 S. Las Vegas Blvd,
Las Vegas, Nevada 89101

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Ms. Houle is seeking a preliminary injunction because two of her coworkers, Nastal and Howard—both of whom knowingly participated in creating a hostile work environment for Ms. Houle and then retaliated against her for complaining about their actions—have returned to work and have continued their coordinated, retaliatory attack.  Having Nastal and Howard return to work forces Ms. Houle to operate under an extraordinary amount of psychological and emotional stress each day and has jeopardized a job Ms. Houle enjoys immensely.   Ms. Houle has voiced her concerns to the Mirage and the Union, however, neither of them have done anything to remedy the situation.  Ms. Houle's ongoing distress, and the Defendants' refusal to do anything to address it, leaves her without an adequate remedy.  As such, she is requesting the Court enjoin the Defendants from allowing Nastal and Howard to work with her at the Heritage.

As an additional consideration, the balance of hardships decidedly favors granting Plaintiff's application.  The Mirage—which is owned by MGM Resorts International and has several sister properties on the Las Vegas Strip—and the Union have ***dozens*** of other locations where Nastal and Howard could work in a similar capacity.  Despite the abundance of options,

Defendants are allowing Nastal and Howard to work in the same bar as, and to work in close proximity to, Ms. Houle.   In other words, neither Defendant will be harmed, *or even inconvenienced*, in any material way by having Nastal and Howard work at another location. Contrarily, Ms. Houle is required to endure substantial emotional and psychological distress each time she works with Nastal and Howard and endure the constant threat of losing her job.   The hardship Ms. Houle is required to endure each day and the complete absence of hardship on the part of either Defendant markedly tips the scales of hardship in favor of Ms. Houle.

## II.     STATEMENT OF FACTS

In August 2013, Ms. Houle began working in Tom Colicchio's Heritage Steak (the "Heritage") located inside the Mirage.   **Houle Decl. ¶ 1**.   Several months after Ms. Houle began employment at the Heritage, several of her coworkers, including Nastal and Howard, began touching each other in a sexually inappropriate manner while at work.   *Id.* **at ¶ 2**.   On numerous occasions, several of Ms. Houle's male coworkers would approach their female coworkers from behind, press their genitals into the female's buttocks or lower back, and touch the female's breasts and/or genitalia.   *Id.* **at ¶ 3**.   It was also a common occurrence for male coworkers to expose their genitals to female coworkers so the female coworkers could touch the male coworkers' genitals.   *Id.* **at ¶ 4**.   These activities took place at various locations within the Heritage, including, but not limited to, the Point of Sale System between the bar area and the lounge area; the service hallways behind the bar area; and the walk-in cooler attached to the service hallways behind the bar area.   *Id.* **at ¶ 5**.

When Ms. Houle learned of these activities she began attempting to avoid areas in the Heritage where there was a higher frequency of sexually inappropriate contact between her coworkers.   *Id.* **at ¶ 6**.   Ms. Houle also expressed to her coworkers, including Nastal and Howard, that their actions were making her extremely uncomfortable.   *Id*.   Ms. Houle also expressed concern that the actions of her coworkers made her, as a female, feel vulnerable and prevented her from focusing on her job.   *Id*.   Despite Ms. Houle's objections and concerns, her coworkers continued their inappropriate actions.   *Id.* **at ¶ 7**.

In October 2015, the inappropriate actions of Ms. Houle's coworkers became

overwhelming and she approached her General Manager, Elisa Hink ("Ms. Hink").   ***Id.* at ¶ 8**. While talking with Ms. Hink, Ms. Houle began sobbing as she told Ms. Hink about what was occurring at the Heritage.   ***Id.* at ¶ 9**.   Ms. Houle described the inappropriate actions of her coworkers to Ms. Hink and detailed the emotional toll it was taking on her.   ***Id.* at ¶ 10**.   Shortly after Ms. Houle's breakdown, she was approached by a member of the Mirage's Human Resources Department and asked to provide a written statement to corroborate the activities she described for Ms. Hink.   ***Id.* at ¶ 11**.   Ms. Houle was hesitant to provide a written statement because she did not want to place additional strain on the working relationships with her coworkers and because she feared her coworkers would retaliate against her.   ***Id.* at ¶ 12**. Despite her reticence, Ms. Houle confirmed to the Human Resources Department that all the actions she described to Ms. Hink had, in fact, taken place and requested that an investigation take place without her written statement.   ***Id.* at ¶ 13**.   Despite Ms. Houle's plea, the Mirage took no action to formally or informally investigate her claims and the Mirage took no action to discipline any of Ms. Houle's coworkers.   ***Id.* at ¶ 14**.

Following Ms. Houle's conversation with the Human Resource Department, a video camera was placed in one of the rear service hallways.   ***Id.* at ¶ 15**.   This camera, however, was unrelated to an investigation into Ms. Houle's claims.   ***Id.* at ¶ 16**.   The camera was only installed after the alcohol used in the Heritage had been stolen on several occasions and was only pointed at the storage location for the alcohol used in the Heritage.   ***Id***.   The video system installed did not survey most of the area in the service hallways or the walk-in cooler, which were frequently used as rendezvous points for sexually inappropriate activity by Ms. Houle's coworkers.   ***Id.* at ¶ 17**.   As will be discussed more fully below, even this minimal step produced corroborating evidence of Ms. Houle's claims and, had the Mirage investigated Ms. Houle's claims in earnest, they almost certainly would have found additional evidence to support Ms. Houle's complaints.

Ms. Houle's coworkers' inappropriate touching continued unabated from October 2015 to April 2016.   ***Id.* at ¶ 18**.   In April 2016, the emotional stress and strain of her working environment once again became unbearable and Ms. Houle informed all her coworkers on

several different occasions that they needed to stop touching and grouping each other or she was going to inform the Human Resources Department of their inappropriate conduct. *Id*. Ms. Houle's coworkers ignored her warnings, so Ms. Houle informed Jessica Kang, the Floor Manager at the Heritage, of her coworkers' actions. *Id. at ¶ 19*. Following Ms. Houle's second complaint, the Mirage's Human Resources Department finally began a formal investigation into the inappropriate sexual conduct of Ms. Houle's coworkers (the "Investigation"). *Id. at ¶ 20*.

On May 12, 2016, Ms. Houle personally witnessed one of her coworkers, Cassandra Kennedy ("Kennedy"), touching the exposed genitals of Nastal in the Heritage. *Id. at ¶ 23*. Over the next 48 hours, Nastal sent Ms. Houle dozens of text messages where he begged her not to tell Human Resources about what she witnessed, called her derogatory names such as "rat," made several threats against Ms. Houle, asserted that she was ruining his life, and threatened to kill himself if the Mirage's Human Resources Department found out what he had done. *Id. at ¶ 24*. Nastal's primary concern was that he did not want his wife, who was not employed at the Heritage, to find out about his sexual escapades. *Id. at ¶ 25.*

During the Investigation, several of Ms. Houle's coworkers, including Nastal and Howard, began systematically isolating Ms. Houle while she was at work, talking about her in derogatory terms, and making thinly-veiled threats against her to other coworkers. *Id. at ¶ 21*. At about this same time, Ms. Houle became aware that Nastal had also made several threatening social media posts that were aimed at her. *Id. at ¶ 22*. These retaliatory attacks were a direct response to the Investigation.

During the Investigation, Nastal, Howard, Kennedy, and Weston Rice ("Rice")—all of whom were engaged in inappropriate sexual conduct at work—were suspended while Human Resources undertook their investigation. *Id. at ¶ 26*. During their suspensions, Nastal, Kennedy, Rice, and Howard conspired together to fabricate a story about how Ms. Houle's complaints were meritless and she was motivated to concoct her story because Nastal had rejected several of her romantic advances. *Id. at ¶ 27*. This story is completely false, however, because Ms. Houle never had romantic feelings for Nastal and she has never approached him to solicit or inquire about a romantic encounter. *Id. at ¶ 28*.

Despite their conspiratorial efforts, Nastal, Kennedy, and Rice were all terminated, but Howard was permitted to return to work at the Heritage. *Id.* **at ¶¶ 29-30**. Howard was initially suspended because she was caught on film allowing one of her male coworkers to caress her breasts, however, she was allowed to return to work after she claimed to be the victim of unwanted and unsolicited groping. *Id.* **at ¶¶ 30-31**. When Howard returned to work she was brought back on a final written warning and was specifically instructed that she could not say or do anything to retaliate against Ms. Houle or she would be terminated. *Id.* **at ¶ 30**.

Following his termination, Nastal filed a grievance with the Union that resulted in him returning to work on November 2, 2016. *Id.* **at ¶ 32**. Nastal was allowed to return to work after the Union claimed that primary piece of evidence—the text messages Nastal sent to Ms. Houle following the May 12th incident where he claimed Ms. Houle was going to ruin his life and threatened to kill himself—only referred to an incident of him eating in the hallway behind the Heritage. *Id.* **at ¶ 33**. When Ms. Houle first learned of Nastal's efforts to seek reinstatement she vehemently expressed her objection to the Union and was told by the Union that representing both her and Nastal was a conflict of interest for the Union. *Id.* **at ¶ 34**. Because of this conflict of interest, the Union informed Ms. Houle that she had no one representing her interests and that she was "blowing in the wind." *Id.* **at ¶¶ 34-35**. In short, the Union informed Ms. Houle there was nothing they could do for her relative to Nastal's reinstatement. *Id.* **at ¶ 36**.

One of the most troubling aspects of Ms. Houle's predicament is that during the Investigation the Mirage and the Union completely disregarded nearly all evidence proffered by Ms. Houle. Before the Investigation Ms. Houle provided lengthy oral and written statements about what was occurring at the Heritage. *Id.* **at ¶ 37**. She informed the Mirage and the Union about the ongoing actions of her coworkers, including Nastal's and Howard's willing participation, and about her efforts to convince her coworkers to stop. *Id.* **at ¶ 38**. Additionally, Ms. Houle provided the Mirage and the Union with the names of at least three coworkers who were willing and able to corroborate her claims regarding Howard and Nastal. *Id.* **at ¶ 39**. All of this evidence was completely ignored and Nastal and Howard were permitted to return to work. *Id.* **at ¶ 40**.

Tellingly, The Mirage and the Union informed Ms. Houle that Nastal would be returning to work at the end of her shift on October 27, 2016—which was immediately before the three-day weekend for Nevada Day and only two business days before Nastal would be reinstated at work. *Id.* **at ¶ 42**. Unsurprisingly, Ms. Houle immediately reiterated her objection and once again expressed concern for her safety and well being. *Id.* **at ¶ 43**. The Mirage's Human Resources Department attempted to assuage Ms. Houle's concerns by informing her that Nastal had been instructed to be on his best behavior and that he was prohibited from any form of retaliatory conduct against Ms. Houle. *Id.* **at ¶ 44**. This has proven to be nothing more than cold comfort.

Since their return to work, Ms. Houle believes Nastal and Howard have conspired together to isolate her and have even enlisted the help of other employees to file false and erroneous complaints against Ms. Houle. *Id.* **at ¶ 45**. Ms. Houle has made several complaints to the Union and the Mirage, but neither of the Defendants have done anything to address the situation. *Id.* **at ¶ 46**. At this point, Ms. Houle fears the actions of Nastal and Howard will eventually result in her termination. *Id.* **at ¶ 47**. This would be an extraordinary loss for Ms. Houle as she thoroughly enjoys her position at the Heritage, is paid very well, and is able to pursue a second job as a financial planner, which she is also passionate about. *Id.* **at ¶ 48**.

Additionally, after informing her supervisor that Howard had retaliated against her, Ms. Houle asked why Howard had not received further discipline given the fact that she had returned to work on the express condition that she not retaliate against Ms. Houle. *Id.* **at ¶ 49**. Ms. Houle's supervisor informed her that she was not aware of any such conditions and, as a result, did not pursue any further discipline against Howard. *Id.* **at ¶ 50**. To date, neither Nastal nor Howard have received any form if discipline, reprimand, or instruction from either of the Defendants for retaliating against her. *Id.* **at ¶ 51**.

## III.   LEGAL ARGUMENT

### a.   Legal Standard

A preliminary injunction pursuant to Rule 65(a) may issue when the partying seeking the injunction satisfies four elements: (1) a likelihood of success on the merits; (2) a likelihood of

irreparable injury; (3) a balance of hardship in favor of the seeking party; and (4) that the injunction be in the public interest.  *See All. For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).  Additionally, these four factors should be considered on a sliding scale, meaning that a stronger showing in one factor may off-set a weaker showing of another factor.  *Id.* at 1131.  For example, when the party seeking an injunction demonstrates "serious questions" about the merits of their case and a balance of hardship that tips sharply in their favor, they have satisfied the likelihood of success on the merits element and the balance of hardships element.  *Id.* at 1136.

> **b.**   **Ms. Houle is Likely to Succeed on the Merits of Her Claims or, at the Very Least, Has Raised Serious Questions About the Merits of Her Claims**

In the First Amended Complaint (ECF No. 6) (the "Amended Complaint"), Ms. Houle alleges several causes of action against the Defendants: (1) Sexual Harassment and Retaliation against the Mirage, (2) Breach of the Duty of Fair Representation by the Union, and (3) Intentional Infliction of Emotional Distress and Negligent Training and Supervision, Training, and Retention against both Defendants.  Ms. Houle is likely to succeed, or has at least raised serious questions about the merits of, her claims.

> *1.   Ms. Houle Will Likely Succeed on the Merits of Her Sexual Harassment and Retaliation Claims Against the Mirage*

> a.   <u>The Mirage is Responsible for the Sexual Harassment Committed Against Ms. Houle</u>

"Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature" is actionable under Title VII when it "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment."  29 CFR §1604.11(a).  In other words, an employee must show "(1) she was subjected to verbal or physical conduct of a sexual nature; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment."  *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 892 (9th Cir. 2005); *see also EEOC v. GNLV Corp.*, No. 2:06-cv-01225-

RCJ-PAL, 2014 U.S. Dist. LEXIS 177439, at *46-47 (D. Nev. Dec. 18, 2014).  An employer is responsible for sexual harassment between employees where the employer, or the supervising employees, "knows or should have known of the conduct."  29 C.F.R. 1604.11(c).

      *EEOC v. GNLV Corp.* ("*GNLV Corp.*") is particularly instructive in this instance.  *GNLV Corp.*, 2014 U.S. Dist. LEXIS 177439 (D. Nev. Dec. 18, 2014).  In this case one of the plaintiffs, Dorothy Blake ("Blake"), complained of the following actions by her co-workers:

- A female supervisor calling over male managers to discuss and "gawk" at women's breasts;
- A female supervisor making sexual gestures and discussing sex with Blake and, when Blake protested, the supervisor thereafter calling Blake a prude;
- A male and female supervisor frequently hugging, kissing, and patting each other on the rear end;
- One instance of a female supervisor drawing a man with a large penis and making off-colored jokes about the drawing to another supervisor;
- Multiple instances of male coworkers talking about sex and women's anatomy in Blake's presence.

*Id.* at * 67-68.

      In analyzing these action the court devotes a single line to whether these actions were unwelcomed and sexual in nature.  The Court simply states that "[t]he Court finds all of the supervisors' comments and conduct to be unwelcome and of a sexual nature."  *Id.* at *69   In *GNLV Corp.* the actions complained of were merely sexual gestures, sexual discussions, a single sexual drawing, and the quasi-sexual action of hugging, kissing, and patting another employee on the rear end.  *Id.* at * 67-68.  Here, Ms. Houle's coworkers were engaged in overt sexual activity.  This included groping and caressing of breasts and genitals.  If the court in *GNLV Corp.* needed only a single line to determine that the sexual discussions and quasi-sexual actions in that case were unwelcomed and of a sexual nature, certainly the Court need not spend much time on the analysis here.  The actions of Ms. Houle's coworkers were, without question, sexual in nature and, given Ms. Houle's consistent reaction, they were unambiguously unwelcome.

1    The sole remaining element, whether the conduct was sufficiently severe and pervasive to

2    alter the terms and conditions of Ms. Houle's employment, is also satisfied.  To establish that

3    conduct is sufficiently severe and pervasive a plaintiff must demonstrate the work environment

4    was "both objectively and subjectively offensive, one that a reasonable person would find hostile

5    or abusive, and one that the victim in fact did perceive to be so."  *Faragher v. City of Boca*

6    *Raton*, 524 U.S. 775, 787, 118 S. Ct. 2275, 2283 (1998); *see also McGinest v. GTE Serv. Corp.*,

7    360 F.3d 1103, 1113 (9th Cir. 2004).

8    When looking at subjective hostility, a court looks at whether the complaining employee

9    subjectively perceived the environment to be hostile.  *Nichols v. Azteca Rest. Enters.*, 256 F.3d

10   864, 873 (9th Cir. 2001).  Subjective hostility can be demonstrated through, among other things,

11   complaints to supervisors.  *Id.* (citing evidence of complaints to multiple supervisors that the

12   employee found the work environment to be hostile); *McGinest*, 360 F.3d at 1113 (citing

13   evidence of complaints to supervisors and the EEOC to demonstrate subjective hostility).  Here,

14   Ms. Houle unquestionably found her work environment to be hostile.   In addition to the

15   complaints Ms. Houle made to Ms. Hink, Ms. Kang, and the Mirage's Human Resources

16   Department, she also went directly to her coworkers to request they stop. In fact, Ms. Houle

17   found her work environment so hostile she began avoiding certain areas of the Heritage and was

18   reduced to tears when discussing her situation with Ms. Hink.  Ms. Houle's actions show,

19   unequivocally, that she found her work environment to be subjectively hostile.

20   To determine objective hostility, a court examines the totality of the circumstances,

21   including the "frequency of discriminatory conduct; its severity; whether it is physically

22   threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

23   with an employee's work performance."  *McGinest*, 360 F.3d at 1113.   These factors are

24   examined from the perspective of a reasonable person belonging to the protected class of the

25   plaintiff.  *Id.* at 1115; *see also Ellison v. Brady*, 924 F.2d 872, 879 (9th Cir. 1991).  This

26   plaintiff-centric analysis is particularly important in sexual harassment claims against women

27   "because women are disproportionately victims of rape and sexual assault" which means that

28   "women have a stronger incentive to be concerned with sexual behavior."  *Ellison*, 924 F.2d at

879.   Additionally, women who are victims of mild forms of sexual harassment may understandably worry whether a harasser's conduct is merely a prelude to violent sexual assault." *Id.* Thus, in a sexual harassment claim asserted by a female plaintiff, the Court must examine the totality of the circumstances from the perspective of a reasonable female in order to determine objective hostility.

In this case, the frequency and severity of the sexual activity experienced by Ms. Houle was extraordinary.   Ms. Houle's coworkers were constantly and consistently engaging in inappropriate activity at work.   It was not uncommon for the sexual activities to take place multiple times in a single week or in a single shift.   In fact, the activities were so persistent that Ms. Houle began avoiding entire sections of the Heritage.   Stated differently, the actions of her coworkers were so pervasive that Ms. Houle worked each day under the unwritten rule that there were certain areas of her workplace she needed to avoid if she did not want to observe her coworkers fondling and groping each other.

This same fact—avoiding certain areas of the Heritage to avoid sexual activities—also demonstrates that the actions were unreasonably interfering with Ms. Houle's work performance. Feeling the need to avoid certain areas of her workplace means that Ms. Houle would have to expend additional time and energy to complete basic tasks and, if avoiding an area was not an option, then opening herself up to potentially lewd and inappropriate conduct.   Moreover, Ms. Houle was reduced to tears at work, which further buttresses the fact that the actions of her coworkers unreasonably interfered with her work.   Ms. Houle's emotional breakdown with Ms. Hink was the result of persistent and prolonged exposure to activity that she found offensive. This prolonged exposure certainly affected her ability to perform her job.   In addition to the activities of her coworkers, Ms. Houle was also worried about her own safety, further hindering her ability to perform her job.   As the Ninth Circuit has determined, it is entirely reasonable for women to be exceptionally concerned about sexual assault as they are more frequently the victims of such attacks.   Being concerned about her safety each time she came to work was grinding on Ms. Houle, as it would be on anyone, and it eventually began unreasonably interfering with her performance.

On a final note, the Mirage knew about the actions of Ms. Houle's coworkers.  Given the longevity and frequency of the inappropriate actions of Ms. Houle's coworkers, the Mirage knew or should have known about this harassment long ago.  Despite this fact, the Mirage discovered that Ms. Houle was being harassed, at the latest, in October 2015 when Ms. Houle discussed her concerns with Ms. Hink and eventually broke down in tears.  Instead of accepting the desperate pleas of Ms. Houle, the Mirage insisted that Ms. Houle file a formal, written complaint.  When she declined, the Mirage abandoned Ms. Houle and left her claims uninvestigated.  Regardless of the exact time the Mirage discovered, or should have discovered, the harassing actions of Ms. Houle's coworkers, it failed to take **any action** to prevent or correct the behavior.  The Mirage's complete lack of action from October 2015 to April 2016 demonstrates they were aware of the situation, failed to take proper corrective action, and should be held liable for the actions of its employees.  29 C.F.R. 1604.11(c).

Anticipating the Mirage's imminent counter-argument, it is also worth pointing out that the Mirage cannot utilize the *Faragher/Ellerth* defense.  The *Faragher/Ellerth* defense allows an employer to avoid vicarious liability for sexual harassment by demonstrating that it exercised reasonable care to prevent and correct any harassing behavior.  See *GNLV Corp.*, 2014 U.S. Dist. LEXIS 177439, at *71.  When an employer fails to take corrective action, it can be held vicariously liable for any harassment from its employees.  *Id.* at *72.  "Reasonable corrective measures should stop the harassment complained of and deter others from engaging in harassing behavior."  *Id.*  Because the Mirage took no action at all to correct the harassment of Ms. Houle, it cannot utilize this defense.  Moreover, the inaction of the Mirage and their allowing Nastal and Howard to return to work as if nothing has happened encourages, not deters, employees to engage in harassing behavior.  Because the Mirage cannot utilize this defense, Ms. Houle is more likely wo succeed on the merits of her claim.

<ol type="a" start="2">
<li>The Mirage Retaliated Against Ms. Houle for Opposing Her Sexual Harassment</li>
</ol>

Ms. Houle will also likely succeed on her retaliation claims against the Mirage.  To establish a claim for retaliation a plaintiff must demonstrate that (1) she was engaged in

1    protected activity; (2) her employer subjected her to an adverse employment action; and (3) a

2    causal link between the protected activity and the adverse employment action.   *Ray v.*

3    *Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000) (citing *Steiner v. Showboat Operating Co.*, 25

4    F.3d 1459, 1464 (9th Cir. 1994)).   One form of protected activity occurs when a plaintiff opposes

5    any practice made an unlawful employment practice by Title VII.   42 U.S.C. § 2000e-3; *see also*

6    *Levy v. Mandalay Corp.*, No. 2:14-cv-01636-GMN-NJK, 2015 U.S. Dist. LEXIS 75093, at *7

7    (D. Nev. June 10, 2015).

8            Importantly, the Ninth Circuit takes an "expansive view" of the types of actions that

9    constitute adverse employment actions.   *Ray*, 217 F.3d at 1241.   To facilitate this expansive

10   view, the Ninth Circuit expressly adopted the guidelines from the EEOC handbook that define an

11   adverse employment action as "any adverse treatment that is based on a retaliatory motive and is

12   reasonably likely to deter [an employee] from engaging in protected activity.   *Id.* at 1242-43.

13   The *Ray* court noted that this analysis did not focus on the ultimate outcome of each employment

14   action, but, rather, focuses on the "deterrent effects" of an employer's actions.   *Id.* at 1243.   In

15   making this determination, the Ninth Circuit Court of Appeals directly and approvingly cited a

16   First Circuit Case holding that **tolerating harassment by other employees** constituted an

17   adverse employment action.   *Id*. (citing *Wyatt v. City of Boston*, 35 F.3d 13, 15-16 (1st Cir. 1994)

18   (adverse employment actions include "demotions, disadvantageous transfers or assignments,

19   refusals to promote, unwarranted negative job evaluations and toleration of harassment by other

20   employees").   Other courts in the Ninth Circuit have cited *Ray* for this proposition as well.   *See,*

21   *e.g.*, *Ramirez v. Olympic Health Mgmt. Sys.*, 610 F. Supp. 2d 1266, 1281 (E.D. Wash. 2009)

22   (citing *Ray* for the proposition that "[e]xamples of adverse employment actions include

23   demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative

24   job evaluations, and toleration of harassment by other employees").

25          Here, the simple and straightforward analysis shows that the Mirage retaliated against

26   Ms. Houle for opposing the ongoing sexual harassment of her coworkers.   It is beyond question

27   that opposing sexual harassment is a protected activity.   *See* 42 U.S.C. § 2000e-3; *see also Levy*,

28   2015 U.S. Dist. LEXIS 75093, at *7.   Ms. Houle's complaints to her supervisors that eventually

1  lead to the Investigation were for the direct purpose of protesting the ongoing sexual escapades

2  of her coworkers that were creating a hostile work environment for her.  This brings Ms. Houle's

3  actions safely within the realm of protected activity.

4  In response to her complaints, Ms. Houle suffered an adverse employment action when

5  the Mirage allowed Ms. Houle's coworkers to continue to harass and retaliate against her.  The

6  Mirage became aware of the harassing sexual activity of Ms. Houle's coworkers, at the latest, in

7  October 2015.  By failing to take any action whatsoever, the Mirage tolerated the ongoing

8  harassment by Ms. Houle's coworkers.  This toleration, as determined by the Ninth and First

9  Circuits, constitutes an adverse employment action.  *Ray*, 217 F.3d at 1243; *Wyatt*, 35 F.3d at 15-

10  16.  More troubling than the Mirage's toleration, is the fact that the Mirage knew of Nastal and

11  Howard's attempts to undermine Ms. Houle before they were suspended during the

12  Investiagtion—and has since learned of a new plot to retaliate against Ms. Houle—yet, has done

13  nothing.  The Mirage's complete inaction is more than just simple toleration, it implicitly

14  condones the actions of Nastal and Howard.  Because the Mirage is condoning these actions, it

15  should be responsible for them.

16          2.      *Ms. Houle Will Likely Succeed on the Merits of Her Breach of the Duty of Fair Representation Against the Union*

18  A union has a "statutory obligation to serve the interests of all members without hostility

19  or discrimination towards any, to exercise its discretion with complete good faith and honesty,

20  and to avoid arbitrary conduct."  *Hays v. Nat'l Elec. Contractors Asso.*, 781 F.2d 1321, 1324 (9th

21  Cir. 1985) (quoting *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S. Ct. 903 (1967)).  "At its most

22  rudimentary level, the union's duty of fair representation is a duty 'to make an honest effort to

23  serve the interests of all, … without hostility towards any.'"  *Addington v. US Airline Pilots

24  Ass'n*, 791 F.3d 967, 982 (9th Cir. 2015) (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330,

25  337, 73 S. Ct. 681, 97 L. Ed. 1048 (1953)) (abbreviation in original).  A union breaches its duty

26  when, in exercising its judgment, the union acts in a discriminatory or bad faith manner.  *Bloom

27  v. Make-up Artists & Hairstylists Local 706*, CASE NO. CV 99-3408 AHM, 1999 U.S. Dist.

28  LEXIS 19216, at *22 (C.D. Cal. Aug. 18, 1999) (citing *Marino v. Writers Guild of America,

*East, Inc.*, 992 F.2d 1480, 1486 (9th Cir. 1993)).

To establish that a Union's actions were discriminatory, a plaintiff must proffer evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives. *Addington*, 791 F.3d at 984. A plaintiff may prove discriminatory motive through circumstantial evidence alone. *Beck v. UFCW, Local 99*, 506 F.3d 874, 883 (9th Cir. 2007) (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003)).

Here, the Union was well aware of the substance of Ms. Houle's grievance, and especially in her allegations regarding Nastal and Howard, yet allowed both of them to return to work at the Heritage. It is also important to point out that the Union cannot claim that Ms. Houle was a solitary witness, because Ms. Houle provided at least three other individuals who could corroborate, and would have corroborated, her allegations. The Union, however, ignored the proffered evidence. The most troubling aspect of the Union's refusal to look into Ms. Houle's corroborating evidence is that when Ms. Houle asked the Union why they were ignoring her allegations and not interviewing her proffered witnesses, the Union told Ms. Houle that it would be a conflict of interest to represent her and Nastal. When she asked for clarification, the Union informed her that they would not be representing her and that she was "blowing in the wind." **Houle Decl. ¶ 35**. The Union's refusal to even consider Ms. Houle's proffered evidence is tantamount to the Union remaining willfully blind to Nastal's and Howard's actions.

It is also important to note that the Mirage and the Union at least partially substantiated Ms. Houle's claims because Kennedy and Rice were terminated and have not returned to work. This means the Mirage and the Union must, when faced with the objective facts, admit that there was merit to Ms. Houle's allegations. Instead of acknowledging this fact and terminating Nastal and Howard as well, the Union chose to believe the flimsy excuses proffered by Nastal and Howard, thereby abandoning Ms. Houle and rejecting a mountain of readily available evidence of their misdeeds. In choosing to do this, the Union became a willing accomplice to the Mirage's discrimination and its actions towards Ms. Houle necessarily take on a similarly discriminatory stain. Because the Union's actions were discriminatory, they breached their duty to fairly represent Ms. Houle.

On a final note, courts often, and rightly, defer to a union's decisions when the union is exercising its judgment.  *See, e.g.*, *Beck*, 506 F.3d at 879 ("a union's conduct constitutes an exercise of judgment entitled to deference").  The Court should afford the Union no such deference here.  As detailed above, the Union disregarded the available testimony of Ms. Houle as well as three other witnesses proffered by Ms. Houle.  This was not a valid judgment, it was a decision to remain willfully blind.  In bringing Nastal and Howard back to work, the Union believed the patently flimsy excuses of Nastal and Howard.  The Union claimed that a series of text messages sent by Nastal where he claimed that Ms. Houle was ruining his life and that he would kill himself if his actions were brought to light, was about Nastal eating in the halls behind the Heritage.  This excuse simply does not pass the sniff test, let alone any kind of real analysis.  Given the obvious failings of the Union, the Court should not afford the Union's judgments any deference.

### c. The Balance of Hardships Tips Distinctly in Favor of Ms. Houle

When considering injunctive relief, a court also considers the balance of hardships between the parties.  *See Cottrell*, 632 F.3d at 1135.  Here, the balance of hardships tilts distinctly and decidedly in favor of Ms. Houle.  Ms. Houle is simply asking that Nastal and Howard not be allowed to work in the one location where she is working, which is an easy request for the Mirage and the Union to fulfill.  Inside the Mirage, there are several bars and several more lounge areas, all of which Nastal and Howard could be re-assigned to work in.  Additionally, the Mirage is owned by MGM Resorts International and, according to its website,[1] MGM Resorts International also owns the Aria, the Bellagio, Vdara, MGM Grand, Mandalay Bay, Monte Carlo, New York New York, Luxor, Excalibur, and Circus Circus.  Relatedly, according to the Union's website,[2] it represents employees in all of the casinos owned by MGM Resorts International.  All of MGM Resorts International's other properties also undoubtedly have several bar or lounge areas where Nastal and Howard would be able to continue working in a similar capacity.  In other words, there are dozens of other options where Nastal and Howard

---

[1] https://www.mgmresorts.com/
[2] http://herelocal165.org/business-agents-hotels/

can find similar employment.

Moreover, Nastal and Howard, not Ms. Houle, should be required to change locations, as they were partially responsible for constantly harassing Ms. Houle.  Allowing Nastal and Howard to remain at the Heritage would essentially return Nastal and Howard to their positions as if nothing had occurred.  If the Court chose this course it would implicitly condone the wildly inappropriate behavior of Nastal and Howard and punish Ms. Houle, who is the victim.  Such an outcome would wreak of unfairness, and is not an outcome this Court should condone.  Moving Ms. Houle would also significantly affect Ms. Houle as she would have to move to a different location, which could easily decrease her job satisfaction and jeopardize her job as a financial planner.  Ms. Houle should not have to bear this burden to satisfy the Mirage, the Union, Nastal, or Howard.

Similarly, the Court cannot, in fairness, allow Nastal and Howard to continue working with Ms. Houle.  Working with Nastal and Howard is stressful because Ms. Houle is forced to remember the sexual antics of her coworkers.  Working with Nastal and Howard also serves as a painful reminder that neither the Mirage nor the Union are truly looking out for her best interest as they are insisting on having her harassers work in close proximity to her.  Furthermore, Nastal and Howard are continually seeking to undermine Ms. Houle's credibility and have her terminated.  Permitting Nastal and Howard to continue working at the Heritage would continue to work a hardship in Ms. Houle as she would be forced to operate under significant additional stress and her job would be constantly under fire.  Such an outcome would be patently unfair.

### d.    Ms. Houle is Suffering, and Continues to Suffer, Irreparable Injury

In this case, Ms. Houle is being irreparably injured on a daily basis as she is forced to relive the emotional injuries already inflicted on her by Nastal and Howard as well as suffer new and additional trauma as they continue to work alongside her.  *See The Hamline Cmty. Gardens v. City of San Jose*, No. 12-CV-000464-LHK (N.D. Cal. Feb. 6, 2012) (acknowledging that "emotional loss" is an injury redressable by an injunctive relief).  First, Nastal and Howard were central figures in a group that carried out a pattern of inappropriate sexual activity in the workplace that lasted for nearly three years.  Their actions were shocking enough on their own,

but they take on an additionally devious character because Nastal, Howard, and their cohorts continued their actions for several months after Ms. Houle pleaded with them to stop and even had a break down at work over the stress they were inflicting upon her.  This kind of obvious disregard for another's emotional and psychological wellbeing is unsettling and harmful, and it is something Ms. Houle has to relive on a near-daily basis.

Similarly, Nastal and Howard are believed to be conspiring against Ms. Houle since their return in an effort to have her terminated.  Nastal and Howard were already part of a conspiracy to discredit Ms. Houle's complaints that lead to the Investigation, and their activities have only continued.  For example, one of Ms. Houle's coworkers, who is close friends with Howard, filed an erroneous complaint against Ms. Houle.  What is more troubling, is that it appears Ms. Houle's current supervisor is completely unaware of the history between Ms. Houle, Nastal, and Howard.  Despite the fact that Ms. Houle has complained of Nastal's and Howard's ongoing efforts to undermine her, no action has been taken to remedy the ongoing retaliation against Ms. Houle.  Thus, Nastal and Howard are able to continue harassing and discriminating against Ms. Houle, thereby providing new, irreparable injury each day.

Finally, the ongoing retaliation of Nastal and Howard jeopardizes Ms. Houle's job.  As the Ninth Circuit has determined "the loss of one's job does not carry merely monetary consequences; it carries emotional damages and stress, which cannot be compensated by mere back payment of wages."  *Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008).  The looming prospect that Ms. Houle could lose her job is magnified by Nastal and Howard's attempts to have her terminated.  If Nastal and Howard are successful, which is a significant possibility, this would just be another form of irreparable damage Ms. Houle would suffer.

The actions of Nastal and Howard were injurious to Ms. Houle at the time they were occurring, and she is now being forced to reopen these injuries each day as she works in close proximity to Nastal and Howard.  The injuries Ms. Houle is suffering cannot simply be monetized and accounted for like lost inventory.  Her injuries here are irreparable and are precisely the kind of injury injunctive relief is intended to prevent.

### e.      Ms. Houle's Requested Injunction is in the Public Interest

Here, granting Ms. Houle's requested injunction is also in the public interest.  Many courts have determined that there is a public interest in preventing sexual harassment and protecting the victims of sexual harassment.  *See, e.g.*, *Gen. Tel. Co. v. EEOC*, 446 U.S. 318, 320, 100 S. Ct. 1698, 1701 (1980) (discussing the "public interest in preventing employment discrimination"); *EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1519 (9th Cir. 1989) (same); *see also Baughn v. Dep't of Forestry & Fire Prot.*, 246 Cal. App. 4th 328, 335, 200 Cal. Rptr. 3d 764, 768 (2016) (stating that there is "widespread" public interest in protecting employees against sexual harassment).  Granting Ms. Houle's injunction would serve this public interest.  Not only was she the victim of sexual harassment and retaliation, she continues to be the target of retaliation by Nastal and Howard.   Consequently, if the Court grants Ms. Houle's Motion, it will be able to protect Ms. Houle, but also provide her with a small measure of vindication.

The only real countervailing interest the Defendants can claim is that the Mirage should have the freedom to manage its workers as it sees fit and that the Union should have the freedom to represent its workers and advocate on their behalf.  These interests, however compelling they may be in general, cannot be used to allow individuals who were knowingly and willfully harassing their coworker to return to work with that same coworker.  This is manifestly unfair.  The inequity is more pronounced when considering that the Mirage and the Union ignored Ms. Houle's testimony, as well as the proffered testimony of several of her coworkers, that would have evidenced the harassment of Nastal and Howard.  Stated differently, the Mirage and the Union cannot be allowed to feign ignorance of sexual harassment, but then claim the Court should not infringe on their interest in managing their own affairs.   The Mirage and the Union have no valid interest in returning Nastal and Howard to work because both of them were responsible for creating a hostile work environment for Ms. Houle and for retaliating against her because she complained about their behavior.

/ / /

**IV.     CONCLUSION**

For months, if not years, Ms. Houle was forced to endure the blatantly inappropriate sexual escapades of her coworkers, a fact implicitly acknowledged by the Mirage and the Union when they agreed to an unchallenged termination of Kennedy and Rice.  This is troubling enough on its own, but now Ms. Houle is being forced to relive these traumatic events each day as she is forced to work with Nastal and Howard.  Moreover, Nastal and Howard have undertaken a coordinated effort to retaliate against Ms. Houle by undermining her credibility and attempting to have her terminated because she informed the Mirage and the Union of their actions.  For this reason, the Court should grant *Plaintiff's Motion for Preliminary Injunction* and prevent the Mirage and the Union from allowing Nastal and Howard from working at the Heritage.

DATED this 27th day of February, 2017.

LEAVITT LEGAL GROUP, P.C.

By:     _____/s/ Kristofer Leavitt_____
Kristofer D. Leaivtt, Esq. (13173)
8670 W. Cheyenne Avenue, Suite #120
Las Vegas, Nevada 89129

*Attorney for Plaintiff Nicole Houle*

1

### **CERTIFICATE OF SERVICE**

2     I hereby certify that on February 27, 2017, I electronically filed the foregoing

3 **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** and any exhibits with the

4 Clerk of the Court using the CM/ECF system.

5

6                                    _____/s/ Kristofer Leavitt_____

7                                    Kristofer Leavitt

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28