# Exhibit 1

# Exhibit 1

```
 1  Kristofer D. Leavitt, Esq.
    LEAVITT LEGAL GROUP, P.C.
 2  Nevada Bar No 13173
    8670 W. Cheyenne Avenue, Suite #120
 3  Las Vegas, Nevada 89129
    (702) 423-7208
 4  kleavitt@leavittlegalgroup.com

 5  Attorney for Plaintiff Nicole Houle
```

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| NICOLE HOULE,<br><br>                    Plaintiff,<br><br>vs.<br><br>THE MIRAGE CASINO-HOTEL LLC; BAR TENDER'S UNION 165;<br><br>                    Defendants. | Case No.: 2:17-cv-00258-GMN-GWF<br><br>**PLAINTIFF'S DECLARATION IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

I, Nicole Houle ("Ms. Houle"), offer this declaration in support of the instant *Plaintiff's Motion for Preliminary Injunction* and declare as follows:

1. In August 2013, I began working in Tom Colicchio's Heritage Steak (the "Heritage") located inside the Mirage.

2. Several months after I began employment at the Heritage, several of my coworkers, Dariusz Nastal ("Nastal") and Lindsay Howard ("Howard"), began touching each other in a sexually inappropriate manner while at work.

3. On numerous occasions, several of my male coworkers would approach their female coworkers from behind, press their genitals into the female's buttocks or lower back, and touch the female's breasts and/or genitalia.

4. It was also a common occurrence for male coworkers to expose their genitals to female coworkers so the female coworkers could touch the male coworkers' genitals.

5. These activities took place at various places within the Heritage, including, but

Page 1 of 6

not limited to, the Point of Sale System between the bar area and the lounge area; the service hallways behind the bar area; and the walk-in cooler attached to the service hallways behind the bar area.

6. When I learned of these activities I began attempting to avoid areas at the Heritage where there was a higher frequency of sexually inappropriate contact and expressed to my coworkers, including Nastal and Howard, that their actions were making me extremely uncomfortable and that they made me, as a female, feel vulnerable and prevented me from focusing on my job.

7. Despite my objections and concerns, my coworkers continued their inappropriate actions.

8. In October 2015, the inappropriate actions of my coworkers became overwhelming and I approached my General Manager, Ms. Elisa Hink ("Ms. Hink").

9. While talking with Ms. Hink, I began sobbing as I told her about what was occurring at the Heritage.

10. I told Ms. Hink about the sexually inappropriate actions of my coworkers and of the toll it was taking on me

11. Shortly after my breakdown, I was approached by a member of the Mirage's Human Resources Department and asked to provide a written statement to corroborate the activities I detailed to Ms. Hink.

12. I was hesitant to provide a written statement because I did not want to place additional strain on the working relationships with my coworkers and because I feared my coworkers would retaliate against me.

13. Despite my reticence, I confirmed to the Human Resources Department that all the actions I described to Ms. Hink had, in fact, taken place and requested that an investigation take place without my written statement.

14. Despite my plea, I am unaware of any no formal or informal investigation that took place regarding my claims was undertaken and none of my coworkers were disciplined for their actions.

15. Following my conversation with the Mirage's Human Resource Department, a video camera was placed in one of the rear service hallways.

16. This camera was unrelated to an investigation into my claims as it was installed after the alcohol used in the Heritage had been stolen on several occasions and was only pointed at the storage location for the alcohol used in the Heritage.

17. The video system installed did not survey most of the area in the service hallways or the walk-in cooler, which were frequently used as rendezvous points for sexually inappropriate activity by my coworkers.

18. My coworkers inappropriate touching continued until April 2016, when I informed all my coworkers on several different occasions that they needed to stop touching and grouping each other or I was going to inform the Human Resources Department of their inappropriate conduct.

19. My coworkers did not heed my warnings, so I informed the Floor Manager at the Heritage, Jessica Kang, of the inappropriate conduct of my coworkers.

20. Following my second complaint, the Mirage's Human Resources Department finally began a formal investigation into the inappropriate sexual conduct of my coworkers (the "Investigation").

21. After the Investigation began, several of my coworkers, including Nastal and Howard, began systematically isolating me while I was at work, talking about me in derogatory terms, and making thinly-veiled threats against me to other coworkers.

22. At about this same time, I became aware that Nastal had made several threatening social media posts that were aimed at me.

23. On May 12, 2016, I personally witnessed one of my coworkers, Cassandra Kennedy ("Kennedy"), touching the exposed genitals of Nastal in the Heritage.

24. Over the next 48 hours, Nastal sent me dozens of text messages where he begged me not to tell Human Resources about what I witnessed, called me derogatory names such as "rat," made several threats against me, asserted that I was ruining his life, and threatened to kill himself if the Mirage's Human Resources Department found out what he had done.

25. Nastal's primary concern was that he did not want his wife, who was not employed at the Heritage, to find out about his sexual escapades.

26. During the Investigation, Nastal, Howard, Kennedy, and Weston Rice ("Rice")—all of whom were engaged in inappropriate sexual conduct at work—were suspended while Human Resources undertook their Investigation.

27. During their suspensions, Nastal, Kennedy, Rice, and Howard all conspired together to fabricate a story about how my complaints were meritless and I was motivated to concoct my complaints because Nastal had rejected several of my romantic advances.

28. This story is completely false, however, because I have never had romantic feelings for Nastal and I have never approached him to solicit or inquire about a romantic encounter.

29. Despite their conspiratorial efforts, Nastal, Kennedy, and Rice were all terminated.

30. Howard was subsequently reinstated following a union grievance process, but was brought back on a final written warning and was specifically instructed that she could not say or do anything to retaliate against me or she would be terminated.

31. Howard was initially suspended because she was caught on film allowing one of her male coworkers to caress her breasts, however, she was allowed to return to work after she claimed to be the victim of unwanted and unsolicited groping.

32. Nastal, who is a member of the Union also filed a grievance, which has resulted in him returning to work on November 2, 2016.

33. Nastal was allowed to return to work after the Union claimed that the text messages he sent me—where he claimed I was going to ruin his life and threatened to kill himself—only referred to him eating in the hallway behind the Heritage.

34. When I first learned of Nastal's efforts to seek reinstatement I expressed my objection to the Union—a union where I is a member— and was told by the Union that representing both Nastal and me was a conflict of interest for the Union and, consequently, I had no one representing my interests.

35. The Union went on to tell me I was "blowing in the wind."

36. In short, the Union informed me there was nothing they could do for me relative to Nastal's reinstatement.

37. Before the Investigation I provided lengthy oral and written statements about what was occurring at the Heritage.

38. I informed the Mirage and the Union about the ongoing actions of my coworkers, including Nastal and Howard, and about my efforts to convince my coworkers to stop.

39. Additionally, I provided the Mirage and the Union with the names of at least three coworkers who were willing and able to corroborate my claims regarding Howard and Nastal.

40. All of this evidence was completely ignored and Nastal and Howard were permitted to return to work.

41. During the Investigation, the Mirage's Human Resources Department informed me they did not want Nastal to return to work at the Mirage and that, even if Nastal returned to the Mirage, he would not return to the Heritage.

42. October 27, 2016—which was immediately before the three-day weekend for Nevada Day and only two business days before Nastal would be reinstated at work—The Mirage and the Union informed me that Nastal would be returning to work at the Heritage.

43. I immediately reiterated my objection and once again expressed concern or my safety and well being.

44. The Mirage's Human Resources Department attempted to assuage my concerns by informing me that Nastal has been instructed to be on his best behavior and that he was prohibited from any form of retaliatory conduct against me.

45. Since their return to work, I believe Nastal and Howard have conspired together to isolate me and have even enlisted the help of other employees to file false and erroneous complaints against me.

46. I have made several complaints to the Union and the Mirage, but neither of the Defendants have done anything to address the situation.

47. At this point, I fear the actions of Nastal and Howard will eventually result in my

1 | termination.

2 | 48. This would be an extraordinary loss for me as I thoroughly enjoys my position at the Heritage, am paid very well, and am able to pursue a second job as a financial planner, which I am also passionate about.

49. After informing my supervisor that Howard had retaliated against me, I asked why she had not received further discipline given the fact that she had returned to work on the express condition that they not retaliate against me.

50. My supervisor informed me that she had not been made aware of any such conditions and, as a result, did not pursue any further discipline.

51. To date, neither Nastal nor Howard have received any form of discipline, reprimand, or instruction from either of the Defendants.

I, Nicole Houle, declare under penalty of perjury under the law of the United State of America that the foregoing is true and correct

Executed on  02/23/2017

*Nicole Houle*
Nicole Houle